216

Joe GELLMAN, Plaintiff,

v.

**COSTA ARMATORI, S.P.A., MARIA COSTA, Defendant.**

**COSTA ARMATORI, S.P.A., Defendant and Third-Party Plaintiff,**

v.

**UNIVERSAL TERMINAL & STEVEDORING CORP. and Carrier International Ltd., Third-Party Defendant.**

No. 74 C 488.

United States District Court,
E. D. New York.

Oct. 21, 1975.

Irving B. Bushlow, Brooklyn, N. Y., for plaintiff.

Michael D. Martocci, New York City, for defendant and third party plaintiff.

Commette, Quencer & Annunziato, New York City, for third party defendant Universal.

Vincent, Berg & Russo, New York City, for carrier International.

## OPINION

PLATT, District Judge.

On March 28, 1974, plaintiff filed a summons and complaint naming in the caption the above-named defendant ship owner and the ship "Maria Costa" and misstating in the body of the complaint that the name of the ship was the "IT-KONIS". Thereafter, when the agent for the designated ship owner claimed that he was not authorized to accept service on the ground that the stated ship did not belong to their company, plaintiff filed an amended complaint and a supplemental summons on July 12, 1974 correcting the name of the ship in the text to conform with the name set in the caption, to wit: the "MARIA COSTA", and the same general agent accepted service of such complaint.

In his amended complaint plaintiff sued the ship owner and ship for $100,000 for personal injuries which he alleged were caused as a result of the negligence of the defendant and the unseaworthiness of the vessel.

On August 13, 1974, defendant filed an answer consisting of a general denial and alleging affirmative defenses (i) failure to state a claim, (ii) contributory negligence, (iii) assumption of risk, (iv) exclusive remedy under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905 et seq., and (v) no negligence or unseaworthiness on the part of the defendant.

On the same date, the defendant filed a third-party summons and complaint against Universal Terminal & Stevedoring Corp. ("Universal"—plaintiff's employer) alleging a breach on its part of its warranty to perform its services as a stevedore in a safe, careful, prudent, proper and workmanlike manner, as well as affirmative and active negligence.

On August 23, 1974, defendant filed an amended answer, alleging as a Sixth Affirmative Defense that plaintiff's action against the defendant for negligence should be barred on the ground that it had accrued. more than three years prior to the commencement of the action and as a Seventh Affirmative Defense that plaintiff had been guilty of laches.

Also on August 23, 1974, defendant filed an additional third-party complaint against Carrier International Ltd. ("Carrier") seeking indemnity on the ground of affirmative and active negligence in that Carrier had constructed, packed and shipped boxes of cargo which did not contain adequate supports and which contained defective wooden boards.

On October 8, 1974, defendant Universal served an answer to the amended third-party complaint generally denying the allegations contained therein.

On October 9, 1974, defendant Carrier served an answer to such complaint also generally denying the allegations contained therein and setting forth a counterclaim against the defendant and a cross-claim against the third-party defendant Universal, alleging in each instance negligence on their part.

The parties stipulated to the following facts:

"On April 3, 1971 at approximately 6:30 P M the vessel 'COSTA MARIA' owned by the defendant was berthed at Pier 2, Brooklyn, New York. Plaintiff was an employee of Universal Terminal & Stevedoring Corp., a stevedoring corporation, engaged by the ship owner to perform stevedoring operations aboard said vessel. That at said time plaintiff was employed as a longshoreman and acting in the course and scope of his employment."

At such time the plaintiff was working in the hold in the number 3 hatch loading cargo with some seven additional longshoremen. Cargo had been loaded in the wings of the hatch earlier in the day and the longshoremen were beginning to load cargo in the square of the hatch.

Two big wooden cases, each 20 feet in length, 8½ feet in width and 8 feet high, were lowered into the hatch. Both of them carried the label "Carrier" on them.

According of the plaintiff, he and his fellow longshoremen, "Jerry" and "Jeso", mounted, by means of a ladder, to the top of one of the cases and the three of them, with himself in the rear, proceeded to walk across the top of such case to unhook the wires by which it was lowered into the hold.

Suddenly without warning plaintiff heard a cracking noise under his left foot which went through the case and he fell down on his left side and shoulder.

Jerry and Jeso ran over and pulled him out; the timekeeper came down and the plaintiff reported his accident to him, and thereafter Jerry took him to the emergency room of the hospital of the Holy Family Division at 155 Dean Street, Brooklyn, New York.

At the hospital, x-rays were taken of plaintiff's left shoulder, his left rib cage and his left leg, all of which were interpreted to be negative.

At the hospital, plaintiff's left arm was placed in a sling and thereafter he was driven home.

For the next six weeks he was treated by Dr. Bauer two or three times a week, was given heat treatments for his shoulder and wore an arm band. In all, he was out of work for seven weeks and he testified that his average earnings at that time had been $200 per week.

At the trial, plaintiff claims he still had pains in his left shoulder, ankle and side during damp weather. When he went back to work some seven weeks after the accident, in the latter part of June, 1971, plaintiff claimed he suffered pains when he tried to lift bananas and other cargo.

On cross examination, plaintiff admitted that immediately before the accident he was not looking down at the crate but straight ahead and further admitted that he had sustained a number of additional accidents, both prior to the accident in question and thereafter. He also admitted that he weighed between 190 and 200 pounds and that he had only 20/800 vision in his right eye with glasses, having undergone a detached retina operation some years prior to the accident.

During the course of plaintiff's cross examination by the counsel for the third-party defendant Carrier, the plaintiff and the defendant settled the action between them for a gross amount of $11,250 which included a lien of $3,782.-44, or a net amount of $7,467.56. The settlement was made with the approval of the third-party defendant Universal but over the objection of the third-party defendant Carrier. At the same time, the plaintiff moved to dismiss that portion of his claim which was predicated upon the negligence of the defendant, and the plaintiff and the defendant agreed that the basis for the settlement was the alleged unseaworthiness of the vessel.

The third-party action by the defendant and third-party plaintiff ship owner continued against the two third-party defendants Universal and Carrier with the continuation of the cross examination by counsel for the latter of the plaintiff.

The third-party plaintiff called its Terminal Manager for Pier 2 who said that he had been working in various supervisory capacities for the stevedores since June of 1967 and in his opinion it was both necessary and proper for longshoremen to walk on top of cases such as were described by the plaintiff and shown in the various photographs introduced into evidence. He also testified that longshoremen, as a general rule, assume that all cases and crates are in such condition that they may be safely walked upon until the contrary is shown.

In addition, he testified that the third-party defendant Universal employed a checker who inspected all cargo when it arrived at the pier and approved the same for loading. If such checker found any defect in any of the packaging or crating of the cargo, he would report the same to the dock boss and note an exception on his approval form. No such exception was apparently noted in the case at bar.

The third-party plaintiff also called Dr. Howard D. Balensweig who examined the plaintiff on November 14, 1974 at the behest of the third-party plaintiff and took x-rays of his shoulders. According to Dr. Balensweig the x-rays of plaintiff's left shoulder showed an impacted fracture of the "radial tuberosity of plaintiff's left shoulder" and in his opinion the "mechanism of the injury (sustained on April 31, 1971) was consistent with this type of fracture." He was also of the opinion that there was a small degree of permanency to such injury and that plaintiff suffered from a 10% restriction in range of motion. He further testified that plaintiff still had pain in the area when pressure was applied to the area.

Despite the fact that the initial x-rays taken at the hospital on the day of the accident had been interpreted negatively, Dr. Balensweig was of the opinion that his findings and opinions (i) were consistent with those theretofore given by Dr. Kennedy who examined the plaintiff in June of 1971, and (ii) were attributable to the accident described by the plaintiff absent any showing of some other injury to the shoulder area in question. Despite a lengthy cross examination by counsel for the third-party defendant Carrier, Dr. Balensweig ad-

hered to his opinions and findings throughout the trial.

The third-party plaintiff also offered, and there was received in evidence, the pre-trial deposition of Carrier's packaging engineer who in April, 1971, was a traffic service supervisor for said company.

Said packaging engineer, William A. Bohall, testified that he was familiar with packaging that had been done for refrigeration units in April, 1971; that in such month Carrier shipped certain refrigeration equipment to Italy and that specifically in April of 1971 Carrier shipped two hermetic centrifugal refrigeration machines on an Italian ship to Italy. In addition, Mr. Bohall testified that prior to shipment such machinery would have been packed in wooden crates which would have been constructed as follows:

> "It (the crate) would have been constructed of six-inch and eight-inch runners and cross pieces on the skids with sides and ends constructed of two-by-four-inch minimum framing and one-inch sheathing, with four-by-four top joisted and one-inch sheathing."

Mr. Bohall further testified that the thickness of the sheathing boards (which would be placed at the top of the crate) would be one inch in soft wood and that there would be five four-by-four joists or cross pieces that would be placed underneath the sheathing at a space of about 42 inches between each such joist or cross piece. The joists would, of course, have been installed to support the sheathing which constituted the top surface of the case.

Most significantly Mr. Bohall testified that the crates were designed to be placed one on top of the other and that the gross weight of each case with a refrigeration machine inserted therein was approximately 15,800 pounds and the weight of the crate itself was some 2,100 pounds.

Plaintiff's theory of unseaworthiness is that there was a latent defect in one of the boards or sheathing across the top of the case on which plaintiff walked which gave way under his 190–200 pound weight when he stepped upon the same.

Defendant and third-party plaintiff, having settled its case with the plaintiff, seeks indemnity from the two third-party defendants on the grounds heretofore indicated.

■ The third-party defendant Universal claims that since there was a total lack of proof that there was any defect in the crate which was obvious to Universal or which should have been detected by Universal, the third-party complaint as against it should be dismissed. The Court agrees that the third-party plaintiff did not sustain its burden of proof in such respects against the third-party defendant Universal and accordingly, grants such third-party defendant's motion to dismiss.

The third-party defendant Carrier also moved to dismiss; first on the ground that plaintiff's case is barred by laches or a three year Statute of Limitations; secondly, for the reason that the plaintiff's case against the defendant should not have been settled over its objections but rather the opportunity to defend the same should have been first tendered to Carrier; thirdly, on the ground that there was no proof that the case in question was packed and shipped by the defendant and fourthly, because there was no proof of any defect in the case.

■ With respect to the first of such contentions, as has been indicated above, plaintiff did commence this action within three years of the date of his accident and specified the proper defendant ship owner and ship in the caption of his summons and complaint but apparently inadvertently misnamed the ship in the text of his complaint. Within four months thereafter, following a rejection

of the service of the summons and complaint by defendant's general agent, plaintiff corrected such mistake and filed and served his amended complaint herein. Under such circumstances, third-party defendant Carrier's defense of laches or a three year Statute of Limitations is not well taken.

■ Third-party defendant Carrier further claims that there was no proof that the case or crate in question belonged to it. However, the plaintiff testified that the crate on which he sustained his accident bore the label Carrier and Carrier's packaging engineer testified on said defendant's deposition that Carrier packaged and shipped two hermetic centrifugal refrigeration machines on an Italian ship to Italy in April of 1971 of the size and general description of the crate in question. In addition plaintiff points to, and· relies on, Carrier's bill of lading and brochure, defendants' cargo plan, photographs, Carrier's blueprints, spec sheet and packing list, and the said packaging agent's failure to testify at the trial although present and available so to do.

Under the circumstances, the Court believes that there was sufficient proof to show that the crate in question had been packaged and shipped by carrier.

■ In this connection, Carrier also suggests that the third-party plaintiff's claim lay against Carrier Air Conditioning Company, Inc. and not against the named third-party defendant Carrier International, Ltd. At Carrier's deposition, its employee (having knowledge of the facts) testified that Carrier changed its name, after the litigation commenced, to "Carrier International Corporation" and that Carrier and Carrier Air Conditioning Company, Inc. were both divisions of Carrier Corporation. Carrier's counsel at the deposition stipulated that all three corporations should be considered as one entity for the purposes of this litigation reserving only the right for ten days after November 13, 1974, to consult with his client before making a formal stipulation to said effect.

Thereafter no question was raised by Carrier to this stipulation until the trial and even then Carrier's counsel failed and refused to produce any witness to testify otherwise.

Accordingly, the stipulation will be honored and to the extent that it is necessary to do so in the light thereof, third-party plaintiff's motion to amend the caption of the action to add as third-party defendants Carrier Air Conditioning Company, Inc., Carrier Corporation and Carrier International Corporation, must be and is hereby granted.

■ Third-party defendant Carrier also argues that the proof was insufficient to sustain a settlement in the gross amount of $11,250 made between the plaintiff and the defendant herein.

In the Court's opinion, this contention is wholly without merit. Plaintiff was out of work for seven weeks and lost wages during such period in the approximate amount of $1,400. In addition, according to Dr. Balensweig, he sustained an impacted fracture of the upper portion of his left shoulder and such shoulder injury had a small degree of permanency. It was also clear from the testimony that the plaintiff sustained pain particularly in his left shoulder for some period of time even after he returned to work and had pain when examined by Dr. Balensweig shortly before the trial when pressure was applied to such area. Under such circumstances, the settlement was a very reasonable one. If the case had been tried to a jury in accordance with the plaintiff's original demand therefor (which he waived at the outset of the trial), the probability is that a far more substantial verdict would have been rendered herein.

■ Carrier also argues that the third-party plaintiff's claim must fail since the defense of plaintiff's case was not tendered to Carrier prior to its settlement with the plaintiff.

Counsel for the third-party plaintiff has represented to the Court in his reply brief herein that "after Costa's counsel negotiated the settlement with plaintiff's counsel (Carrier's counsel refused to participate in the settlement negotiations) and before the settlement was announced in court, Costa's counsel and Carrier's counsel conferred in the witness room when Costa's counsel requested Carrier to pay the settlement or assume the defense and give Costa a hold harmless indemnification agreement. Carrier's counsel refused to recommend this disposition * * * ".

Even if the Court were to disbelieve Costa's counsel's representations, which it does not, the Court fails to understand how Carrier was prejudiced herein by the failure of the plaintiff's counsel to proceed further in the case. Plaintiff had completed his direct testimony when the settlement was made and carrier's counsel cross-examined him at length. All counsel knew that the third-party plaintiff's expert Dr. Howard Balensweig had given his opinion that plaintiff had sustained a fracture and even if he could have refused to testify as an expert for the plaintiff the latter surely could and would have produced an expert who would have read the x-rays consistently with Dr. Balensweig. Such would have been more than sufficient to sustain the relatively modest settlement herein.

Moreover, since FRCP 14(a) provides that the third party defendant may assert any defenses that the third-party plaintiff may have against the original plaintiff's claim and relitigate the question of defendants' liability to the plaintiff (including the question of damages) and since Carrier did so in the case at bar, there is no basis for the contention of Carrier. See Wright & Miller, *Federal Practice and Procedures: Civil §* 1457 at pp. 305 et seq.

Finally, third-party defendant Carrier contends that there was no proof of any defect in the crate or case in question. Again, however, the proof showed that the crates in question were designed to sustain the weight of one another, i. e., some 15,800 pounds and that each crate weighed approximately 2,100 pounds. The proof further showed that the top of the crate was made of one inch thick sheathing supported by five four-by-four cross pieces or joists. In addition, in the opinion of at least one witness (Universal's terminal manager) such a crate with one-half inch thick sheathing and a reasonable number of cross pieces would be sufficient to carry the weight of a person such as the plaintiff. Moreover, plaintiff's testimony was that his two fellow longshoremen "Jerry" and "Jeso" proceeded him across the top of the crate without any problems.

Under the circumstances, the inference is inescapable that one of the boards or pieces of sheathing had a latent defect which manifested itself when plaintiff placed his left foot thereon and it gave way. For such latent defect, only the third-party defendant Carrier is responsible and since such latent defect was the sole cause of the plaintiff's injuries, said third-party defendant must bear the ultimate liability therefor.

In connection with this contention Carrier argues that it should not be responsible for the consequences of its conduct unless the risk of injury is reasonably foreseeable and because the crating and shipping divisions of Carrier were located in Syracuse, New York, it could not have foreseen that longshoremen in Brooklyn might have occasion to walk on the crates when loading them on the ships.

In the case of a longshoreman walking on cardboard cartons or those made of thin plywood or other light material in which there were glass or other such light products, Carrier's "foreseeability" argument might have merit. However, there is no dispute that the crates were designed to sustain the weight of one another, i. e., some 15,800 pounds. One would normally presuppose that a crate of that size and weight would be able to

sustain the weight of a 200 pound man at any given location and it is not unreasonable to impose a duty upon a crater and shipper to foresee that one or more persons may have to walk upon a crate of that size one or more times during the shipping process to unhook wires used in raising or lowering the crate.

Here again there is no real merit to Carrier's contention.

Accordingly, the third-party plaintiff is entitled to full indemnity from the third-party defendant Carrier, plus attorneys fees and costs herein. If the parties cannot settle the reasonable attorneys fees of counsel for the third-party plaintiff, the latter is requested to submit an affidavit of time and services to the Court as promptly as possible and the Court will then determine whether a further hearing is necessary or whether it is in a position at such point to fix such fees.

Since the Court has found that the defect in the crate was latent or hidden, there is no basis for Carrier's cross claim against Universal and that must be dismissed.

The foregoing constitute the findings of fact and the conclusions of law of this Court.